UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ROYAL & SUN ALLIANCE INSURANCE, PLC, and INGRAM MICRO, INC., )<br>)<br>) | Civil Action No.<br>14-CV-3770 (JFK) (MHD) |

ROYAL & SUN ALLIANCE INSURANCE, PLC,
and INGRAM MICRO, INC.,                        )
                                               )   Civil Action No.
            Plaintiffs,                        )   14-CV-3770 (JFK) (MHD)
                                               )
      - against-                               )
                                               )
E.C.M. TRANSPORT, INC. and ECM                 )
TRANSPORT, LLC,                                )
                                               )
            Defendants.                        )
                                               )

---

## ECM TRANSPORT'S MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

---

GEORGE W. WRIGHT & ASSOCIATES, LLC
Attorneys for Defendants
88 Pine Street, 7th Floor
New York, New York 10005
(201) 342-8884

George W. Wright, Esq.
Narinder S. Parmar, Esq.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...................................................................... ii

PRELIMINARY STATEMENT............................................................ 1

LEGAL ARGUMENTS......................................................................... 1

POINT I:      STANDARD FOR SUMMARY JUDGMENT................................ 1

POINT II:     THE CHOICE OF LAW STANDARD.......................................... 2

POINT III:    CONTRACT INTERPRETATION LAW IS
              SUBSTANTIALLY THE SAME IN NEW
              YORK, CALIFORNIA AND PENNSYLVANIA............................... 5

POINT IV:     THE 2013 TRANSPORTATION CONTRACT
              UNAMBIGUOUSLY SUPERSEDES
              THE 2007 SERVICE AGREEMENT.......................................... 8

POINT V:      ECM'S $100,000 LIMITATION OF
              LIABILITY IS VALID......................................................... 15

POINT VI:     IF THE 2007 SERVICE AGREEMENT
              APPLIES, ECM'S LIABILITY SHOULD
              NOT EXCEED $250,000...................................................... 19

POINT VII:    IF THE 2007 SERVICE AGREEMENT APPLIES,
              PLAINTIFFS MAY NOT RECOVER FULL
              REPLACEMENT VALUE UNLESS THEY
              ESTABLISH THE LOSS WAS CAUSED BY
              ECM'S FAILURE TO COMPLY WITH THE
              "MINIMUM SECURITY GUIDELINES"...................................... 20

POINT VIII:   ECM DID NOT BREACH THE "MINIMUM
              SECURITY GUIDELINES"..................................................... 22

CONCLUSION.................................................................................... 28

## TABLE OF AUTHORITIES

**Page**

### CASES

Abifadel v. Cigna Ins. Co., 8 Cal.App. 4th 145, 9 Cal. Rptr. 2d 910
(Cal.App. 2d Dist.1992)……………………………………………….. 7

Aho v. Cleveland-Cliffs, Inc., 219 Fed. Appx. 419, 219 Fed. Appx. 419,
2007 U.S. App. LEXIS 5592 (6th Cir. 2007)……………………………… 22

Air Support International, Inc. v. Atlas Air, Inc., 54 F.Supp.2d 158
(E.D.N.Y. 1999)…………………………………………………….. 9

AmerisourceBergen Drug Corp. v. Ciolino Pharm. Wholesale Distributors,
2011 U.S. Dist. LEXIS 55423 (E.D. Pa. 2011)…………………………… 10

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 91 L. Ed. 2d 202,
106 S. Ct. 2505 (1986)……………………………………………… 1

Aramony v. United Way of America, 254 F.3d 403 (2d Cir. 2001)………………. 23

Armor Holdings Inc., v. Jim Layman & Associates, LLC, 2006 U.S. Dist.
LEXIS 18640 (W.D. Mich. 2006)…………………………………….. 11

Archambo v. Lawyers Title Ins. Co., 466 Mich. 402, 646 N.W.2d 170
(2002)………………………………………………………… 11

Barkanic v. General Admin. of Civil Aviation of the People's Republic
of China, 923 F.2d 957 (2d Cir. 1991)……………………………….. 2-3

Bauman v. Millbrook Care Ltd. Partnership, 850 F.Supp. 1227 (S.D.N.Y. 1994)…. 12

Bermont Operating Corp. v. City of New York, 95 A.D.2d 729,
463 N.Y.S.2d 830 (1st Dept. 1983)…………………………………… 6

Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456,
161 N.Y.S.2d 90 (1957)……………………………………………. 7

Bhari Information Technology Systems Pvt. Ltd. v. Allied Boston Bank, Inc.,
2005 U.S. Dist. Lexis 40094 (N.D. Cal. 2005)…………………………… 10

Blue Ridge Farms, Inc. v. Crown Equip. Corp., 2005 U.S. Dist. LEXIS 7217
(E.D.N.Y. 2005)……………………………………………………. 3

Breed v. Insurance Co. of North America, 46 N.Y.2d 351,
413 N.Y.S.2d 352 (1978)............................................................... 7

Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525 (2d Cir. 1990)............... 6

Business Integration Technology v. Mulesoft Inc., 2011 U.S. Dist. Lexis
136080 (N.D. Cal. 2011)............................................................... 10

Celotex v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).......... 1, 2

Ciofalo v Vic Tanney Gyms, 10 N.Y.2d 294 (1961)..................................... 21

Citigifts, Inc. v. Pechnik, 112 A.D.2d 832, 492 N.Y.S.2d 752 (1985) (mem.),
aff'd mem., 67 N.Y.2d 774, 500 N.Y.S.2d 643 (1986)................................. 9

City of Los Angeles v. Gurdane, 59 F.2d 16 (9th Cir. 1932)........................... 8

Cooperative Refinery Ass'n. v. Consumers Public Power District,
190 F.2d 852 (8th Cir. 1951)........................................................ 13

County of Suffolk v. Alcorn, 266 F.3d 131 (2nd Cir. 2011)............................ 23

Crain v. Burroughs Corp., 560 F. Supp. 849 (C.D.Cal. 1982)........................... 12

Crossen v. Foremost-McKesson, Inc., 537 F. Supp. 1076 (N.D. Cal. 1982).......... 12

Curley v. AMR Corp., 153 F.3d 5 (2d Cir. 1998)...................................... 3

EFS National Bank v. Averitt Express, Inc., 164 F.Supp.2d 994
(W.D. Ten. 2001)................................................................... 18

Emerson Elec. Supply Co. v. Estes Express Lines Corp., 451 F.3d 179
(3d Cir. 2006)..................................................................... 17

Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F. Supp. 987 (S.D.N.Y. 1968)... 7

Factory Mutual Insurance Co. v. Lexington Ins. Co., 2003 U.S. Dist.
Lexis 2159 (W.D. Ky. 2003)......................................................... 25

Finucane v. Interior Constr. Corp., 264 A.D.2d 618, 695 N.Y.S.2d 322
(1st Dept. 1999)................................................................... 4

George N. Pierce Co. v. Wells, Fargo & Co., 236 U.S. 278, 59 L.Ed. 576,
35 S.Ct. 351 (1915)................................................................... 16

Glen-Gery Corp. v. Warfel Constr. Co., 1999 Pa.Super 175, 734 A.2d 926
(Pa.Super. Ct. 1999)................................................................. 8

Gross v Sweet, 49 N.Y.2d 102, 424 N.Y.S.2d 365 (1979)............................... 21

Hart v. Pennsylvania R.R. Co., 112 U.S. 331, 5 S.Ct. 151, 28 L.Ed. 717 (1884)...... 16

Health-Chem Corp. v. Baker, 915 F.2d 805 (2nd Cir 1990).............................. 9

Holguin v. Dish Network LLC, 229 Cal. App. 4th 1310, 1324, 178
Cal. Rptr. 3d 100 (2014)............................................................ 12

Hughes v. United Van Lines, Inc., 829 F.2d 1407 (7th Cir. 1987)..................... 17

Hughes Aircraft Co. v. N. Am. Van Lines Inc., 970 F.2d 609 (9th Cir. 1992)......... 18

Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274 (2d Cir. 1989)........... 7

IBM v. Liberty Mut. Fire Ins. Co., 363 F.3d 137 (2d Cir. 2004)..................... 3

Independent Energy Corp. v. Trigen Energy Corp., 944 F.Supp. 1184
(S.D.N.Y. 1996)..................................................................... 12

Ingram Micro, Inc. v. Airoute Cargo Express, Inc., 154 F.Supp.2d 834
(S.D.N.Y. 2001)..................................................................... 19

In re Allstate Ins. Co., 81 N.Y.2d 219, 597 N.Y.S.2d 904 (N.Y. 1993)............... 3

International Klafter Co., Inc. v. Continental Cas. Co., 869 F.2d 96
(2d Cir. 1989)...................................................................... 6

JA Apparel Corp. v. Abboud, 568 F.3d 390 (2d Cir. 2009)............................ 20

Joseph M. Coleman & Assocs. v. Colonial Metals Co., 1996 U.S. Dist.
LEXIS 8901 (E.D.Pa. 1996)........................................................... 12

Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S. Ct. 1020,
85 L. Ed. 1477 (1941)............................................................... 2

Knight v. U.S. Fire Ins. Co., 804 F.2d 9 (2d Cir. 1987)............................ 2

Kreiss v. McCown De Leeuw & Co, 37 F.Supp.2d 294 (S.D.N.Y. 1999)............  9-12

Larsen v. Johannes, 7 Cal. App. 3d 491, 86 Cal. Rptr. 744 (1970)....................  7

Maalouf v. Salomon Smith Barney, Inc., 2004 U.S. Dist. LEXIS 17873
(S.D.N.Y. 2004)..................................................................................  3, 4

MacKinnon v. Truck Ins. Exchange, 31 Cal.4th 635 (2003)............................  7

Mallad Constr. Corp. v. County Fed. Sav. & Loan Assn., 32 NY2d 285
(1973)...............................................................................................  6

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).................................................  2

Mechanical Technology, Inc. v. Ryder Truck Lines, 766 F.2d 1085
(2d Cir. 1985).....................................................................................  18

Medical Sales & Consulting Group v. Plus Orthoped..., 2011 U.S. Dist.
LEXIS 123497 (S.D. Cal. 2011)..............................................................  21

Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884 (2d Cir. 1990)......  5

Miller v. United States, 363 F.3d 999 (9th Cir. 2004)..................................  19

Mitsubishi Aircraft International, Inc. v. Brady, 780 F.2d 1199 (5th Cir. 1986).....  13

Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc., 2005 U.S. Dist.
LEXIS 8896 (S.D.N.Y. 2005)..................................................................  5

National Small Shipments Traffic Conf. v. United States, 887 F.2d 443
(3d Cir. 1989).....................................................................................  14

Neiman Marcus Group, Inc. v. Quast Transfer, Inc., 1999 U.S. Dist.
Lexis 9564, 1999 WL 436589 (N.D.Ill. 1999)............................................  18-19

Nipponkoa Insurance Co. Ltd. v. Watkins Motor Lines, Inc., 431 F.Supp.2d
411 (S.D.N.Y. 2006).............................................................................  18

Northville Indus. Corp. v. Fort Neck Oil Terminals Corp., 100 A.D.2d 865,
474 N.Y.S.2d 122 (2nd Dept. 1984) (mem.), aff'd mem., 64 N.Y.2d 930,
488 N.Y.S.2d 648 (1985).......................................................................  9

O'Farrell v. Steel City Piping Co., 266 Pa. Super. 219, 403 A.2d 1319
(Pa. Super. Ct. 1979)............................................................................    8

OneBeacon Insurance Company v. Haas Industries, Inc., 634 F.3d 1092,
2011 U.S.App. Lexis 4603 (9th Cir. 2011)...........................................    17

151 West Associates v. Printsiples Fabric Corp., 61 N.Y.2d 732,
472 N.Y.S.2d 909 (1984)......................................................................    21

Pall Mall Corp. Hospitality, Inc. v. Gage Mktg. Group, 2000 U.S. Dist.
LEXIS 17038 (S.D.N.Y. 2000)..............................................................    4

Pantone, Inc. v. Esselte Letraset Ltd., 691 F. Supp. 768 (S.D.N.Y. 1998)............    21

Pardee Constr. Co. v. Ins. Co. of the West, 77 Cal. App. 4th 1340,
92 Cal. Rptr. 2d 443 (Ct. App. 2000).....................................................    25

Parsons v. Bristol Development Co., 62 Cal.2d 861 (1965)...........................    7

Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1 (2d Cir. 1996)...............    2, 3

Producers Dairy Delivery Co. v. Sentry Ins. Co., 41 Cal.3d 903,
226 Cal. Rptr. 558, 718 P.2d 920 (1986)................................................    7

Protective Closures Co. v. Clover Industries, Inc., 394 F.2d 809 (2d Cir. 1968)......    9

Prudential Insurance Company of America v. Barnes, 285 F.2d 299
(9th Cir. 1960)....................................................................................    21

Raleigh Assoc. v. Henry, 302 N.Y. 467 (1951) mot for rearg. den
302 N.Y. 940 (1951)............................................................................    6

Rich v. Shrader, 2010 U.S. Dist. LEXIS 98267 (S.D. Cal. 2010)....................    24

Rondout Valley Cent. Sch. Dist. v. Coneco Corp., 339 F. Supp. 2d 425
(N.D.N.Y. 2004)..................................................................................    4

Sassy Doll Creations, Inc. v. Watkins Motor Lines, 331 F.3d 834
(11th Cir. 2003)...................................................................................    17

Schuster v. Dragone Classic Motor Cars, Inc., 67 F. Supp. 2d 288
(S.D.N.Y. 1999)..................................................................................    4

vi

Schweitzer Aircraft Corp. v . Landstar Ranger, Inc., 114 F.Supp.2d 199
(W.D.N.Y. 2000)............................................................................ 18

Seiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d 425 (2d Cir. 1992)............ 5

Sicor Ltd. v. Cetus Corp. 51 F.3d. 848 (9th Cir. 1995).................................. 15

Siren v. Estes Express Lines Corp., 249 F.3d 1268 (11th Cir. 2001)................... 17, 18

Slatt v. Slatt, 64 N.Y.2d 966, 488 N.Y.S.2d 645 (1985)................................ 5

Sloan & Co. v. Liberty Mut. Co., 653 F.3d 175 (3d Cir. 2011)........................ 8

Smith v. Normandy Props., LLC, 2007 U.S. Dist. LEXIS 77752 (W.D. Pa 2007)... 11

Steuart v. McChesney, 444 A.2d 659, 498 Pa. 45 (Pa. 1982)............................ 8

Swift Textiles, Inc., v. Watkins Motor Lines, Inc., 799 F.2d 697 (11th Cir. 1986)... 18

Taylor v United States Cas. Co., 269 N.Y. 360 (1936)................................... 19

Trilogy Dev. Group, Inc. v. Teknowledge Corp., 1996 Del. Super.
LEXIS 342 (Sup. Ct. Del. 1996)......................................................... 5

United States ex rel. International Contracting Co. v. Lamont, 155 U.S.
303, 39 L. Ed. 160, 15 S. Ct. 97 (1884)................................................ 13

United States Leasing Corp. v. DuPont, 69 Cal. 2d 275, 70 Cal. Rptr. 393,
444 P.2d 65 (1968)......................................................................... 7

Verizon New Jersey Inc. v DMJM Harris, 2009 U.S. Dist. LEXIS 37678
(N.J. 2009).................................................................................. 11

Volunteer Firemen's Ins. Servs., Inc. v. Fuller, 2012 U.S. Dist. LEXIS 181215
(M.D. Pa. 2012)............................................................................ 10

Walk-In Med. Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260
(2d Cir. 1987)............................................................................... 6

Wards Co., Inc. v. Stamford Ridgeway Assoc., 761 F.2d 117 (2d Cir. 1985)........ 7

W. Branch Holding Co. v. Trans Mktg. Houston, Inc., 722 F. Supp.
1339 (E.D. Va. 1989)...................................................................... 5

vii

W.W.W. Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 565 N.Y.S.2d 440
(1990) ............................................................................    6


**COURT RULES**

Fed.R.Civ.P. 56............................................................................    1

California Civil Code §1625..............................................................    10

California Code of Civil Procedure s 1856............................................    10


**STATUTES**

49 U.S.C. §11707..........................................................................    15

49 U.S.C. §14706..........................................................................    13, 15


**MISCELLANEOUS**

Black's Law Dictionary....................................................................    8, 23

83 C.J.S. Supersede 888-89.............................................................    8

en.wikipedia.org/wiki/Additional_insured.............................................    23

## PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted on behalf of defendants, E.C.M. TRANSPORT, INC. and ECM TRANSPORT, LLC ("ECM"), in support of ECM's cross-motion for an Order pursuant to Fed.R.Civ.P. 56 granting partial summary judgment (1) limiting ECM's maximum liability to the sum of $100,000.00 with respect to the subject cargo loss; or alternatively (2) limiting ECM's liability to the sum of $250,000.00.

ECM contends that the only agreement in effect between the parties at the time of August 18, 2013 loss was the Sections A, B and C transportation contract fully executed on July 31, 2013 (Exhibit "14") that limits ECM's maximum liability for cargo loss to $100,000.00. Alternatively, if the Court determines that the February 16, 2007 Service Agreement (Exhibit "3") was in effect at the time of the subject loss, or that the above $100,000.00 limitation is invalid, ECM's liability should be limited to $250,000.00.

## LEGAL ARGUMENTS

## POINT I

## STANDARD FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Celotex v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. Id. A material fact is one whose resolution would "affect the outcome of the suit under governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The Court must view the inferences

1

to be drawn from the facts in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

The non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 12 (2d Cir. 1987). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. <u>Celotex</u>, 477 U.S. at 322-23.

## POINT II

## THE CHOICE OF LAW STANDARD

Choice of law is an issue in this case because (A) the alleged 2007 Service Agreement (Exhibit "3") and the governing 2013 Sections A, B and C transportation contract (Exhibit "14") were negotiated and executed between ECM's Pennsylvania office and INGRAM MICRO'S New York office; (B) the subject shipment was stolen in Pennsylvania; (C) the old 2007 Service Agreement contains a California choice of law provision and (D) the 2013 Sections A, B and C transportation contract does not contain any such provision. New York choice of law principles apply to this case. <u>Klaxon Co. v. Stentor Electric Mfg. Co.</u>, 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Although <u>Klaxon</u> applies to diversity cases, the Second Circuit has applied forum state choice of law principles in non-diversity cases. See <u>Pescatore v. Pan Am. World Airways, Inc</u>, 97 F.3d 1, 14 (2d Cir. 1996) [applying New York law to a Warsaw Convention case];[1] <u>Barkanic v. General Admin. of Civil Aviation of the People's Republic of</u>

---

[1] Holding "[T]he law is unsettled when it comes to applying either a federal common law choice of law rule or state choice of law principles in non-diversity cases," but questioning the use of federal common law bases on "the Supreme Court's more recent pronouncements upon the limited domain of federal common law." <u>Id.</u> at 12-13.

China, 923 F.2d 957, 961 (2d Cir. 1991) [applying New York's choice of law principles in action arising under FSIA].

In New York, the first question in a choice of law analysis is whether there is an actual conflict of laws. Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998) [citing In re Allstate Ins. Co., 81 N.Y.2d 219, 597 N.Y.S.2d 904 (N.Y. 1993)]. An actual conflict is one that could "have a significant possible effect on the outcome of the trial." Id.; see also Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 14 (2d Cir. (1996) [actual conflict found where different substantive rules exist].

Where there is no actual conflict between the potentially applicable bodies of law, the Court should dispense with the choice-of-law analysis and apply the law of the forum, even when a dispute is governed by a contract containing a choice of law provision. Blue Ridge Farms, Inc. v. Crown Equip. Corp., 2005 U.S. Dist. LEXIS 7217, *24-25 (E.D.N.Y. 2005) [citing Maalouf v. Salomon Smith Barney, Inc., 2004 U.S. Dist. LEXIS 17873, *30 (S.D.N.Y. 2004)]; see also IBM v. Liberty Mut. Fire Ins. Co., 363 F.3d 137 (2d Cir. 2004) ["Choice of law does not matter ... unless the laws of the competing jurisdictions are actually in conflict."].

**A.  The Old 2007 Service Agreement.**

Paragraph 17.0 of the 2007 Service Agreement states:

17.0    GOVERNING LAW

The laws of the State of California shall govern this Agreement to the extent the latter are not inconsistent with applicable federal law.

As discussed below, there is no substantial difference among the rules governing contract interpretation in California, New York and Pennsylvania. Thus, New York law should be applied if the 2007 Agreement is held applicable.

B. __The Relevant 2013 Transportation Contract__.

        Even if there was an actual conflict between New York and California laws, the California choice-of-law provision in the old 2007 Service Agreement (Exhibit "3") is not applicable to the interpretation of the governing 2013 Sections A, B and C transportation contract (Exhibit "14"). The New York courts enforce choice-of-law clauses if the law chosen has a reasonable relationship to the agreement and does not violate a fundamental public policy of New York. Finucane v. Interior Constr. Corp., 264 A.D.2d 618, 695 N.Y.S.2d 322, 324 (1st Dept. 1999). The question, however, is whether the choice-of-law provision in the 2007 Agreement applies to the subsequent 2012 and 2013 agreements (Exhibits "13" and "14") that lack choice-of-law clauses and were made five (5) to six (6) years after the parties' business relationship began in 2007. "It is unlikely that these two contracts could be seen as a single agreement, given the length of time between the two." Maalouf v. Salomon Smith Barney, Inc., 2004 U.S. Dist. LEXIS 17873, *22 n.70 (S.D.N.Y. 2004) [involving contracts entered into only one (1) year apart].

        Whether a choice-of-law clause in a contract governs claims collateral to, but beyond, the contract depends in part, on the breadth of the clause. Pall Mall Corp. Hospitality, Inc. v. Gage Mktg. Group, 2000 U.S. Dist. LEXIS 17038, *21 (S.D.N.Y. 2000) [declining to extend contract choice-of-law clause to unfair trade practices tort claim]; Schuster v. Dragone Classic Motor Cars, Inc., 67 F. Supp. 2d 288, 290 (S.D.N.Y. 1999) [effect of governing law clause depends on its breadth]; Rondout Valley Cent. Sch. Dist. v. Coneco Corp., 339 F. Supp. 2d 425, 440 (N.D.N.Y. 2004) [court not bound to choice-of-law clause where issue is collateral to contract containing the provision]. The choice-of-law provision is limited, and expressly applies, to only the 2007 Service Agreement (Exhibit "3").

        Some courts refuse to apply a choice-of-law clause in a previous contract to a subsequent agreement, even when the new agreement modifies or discharges an obligation under

the original agreement. <u>Trilogy Dev. Group, Inc. v. Teknowledge Corp.</u>, 1996 Del. Super. LEXIS 342 (Sup. Ct. Del. 1996) ["For the most part, [courts applying law of underlying contract to an accord and satisfaction] have applied the law of the chosen forum to subsequent agreements on a pro forma basis, with little or no legal analysis on the choice of law issue."]; <u>W. Branch Holding Co. v. Trans Mktg. Houston, Inc.</u>, 722 F. Supp. 1339 (E.D. Va. 1989) [choice of law provision of underlying contract does not govern accord and satisfaction, which is an independent agreement]; <u>Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc.</u>, 2005 U.S. Dist. LEXIS 8896, *9 (S.D.N.Y. 2005).

The applicable 2013 Sections A, B and C transportation contract (Exhibit "14") was an entirely new agreement.  Furthermore, the choice-of-law provision in the old 2007 Service Agreement (Exhibit "3") is narrow in its scope and purports to apply only to the extent it does not conflict with federal law.  Thus, there is no justification for the 2007 Agreement's choice-of-law clause to be deemed controlling.  As no choice-of-law clause terms control here, and there is no conflict of law between New York and Pennsylvania law, New York law should apply to any contract interpretation issues in this action.

<b><u>POINT III</u></b>

<b>CONTRACT INTERPRETATION LAW IS SUBSTANTIALLY<br><u>THE SAME IN NEW YORK, CALIFORNIA AND PENNSYLVANIA</u></b>

**A.  <u>New York Contract Interpretation Law.</u>**

The purpose of contract interpretation is to give effect to the parties' intentions. <u>Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.</u>, 906 F.2d 884, 889 (2d Cir. 1990); <u>Slatt v. Slatt</u>, 64 N.Y.2d 966, 488 N.Y.S.2d 645, 646 (N.Y. 1985). Where the language of a contract is unambiguous, the question of interpretation is one of law and summary judgment may be granted. <u>Seiden Assoc., Inc. v. ANC Holdings, Inc.</u>, 959 F.2d 425, 428 (2d Cir. 1992).  In such cases, "the

intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible." International Klafter Co., Inc. v. Continental Cas. Co., 869 F.2d 96, 100 (2d Cir. 1989); W.W.W. Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 443, (1990) [extrinsic evidence may not be considered in order to create an ambiguity]. In the absence of ambiguities, there is no reason to look beyond the clear and plain wording of the contract to determine what might have been in the mind of one of the contracting parties. Raleigh Assoc. v. Henry, 302 N.Y. 467, 473, (1951) mot for rearg. den 302 N.Y. 940 (1951); Bermont Operating Corp. v. City of New York, 95 A.D.2d 729, 463 N.Y.S.2d 830 (1st Dept. 1983).

On the other hand, where contractual language is ambiguous, and where there is conflicting extrinsic evidence relevant to the parties' actual intent, a material question of fact exists, and summary judgment should be denied. Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 528 (2d Cir. 1990). As succinctly stated by the New York Court of Appeals: "[W]here a question of intention is determinable by written agreements, the question is one of law, appropriately decided by an appellate court * * * or on a motion for summary judgment. Only where the intent must be determined by disputed evidence or inferences outside the written words of the instrument is a question of fact presented" Mallad Constr. Corp. v. County Fed. Sav. & Loan Assn., 32 N.Y.2d 285, 291 (1973).

Under New York law, the determination of whether a contract term is ambiguous is a threshold question for the court. Walk-In Med. Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987). A contractual phrase is ambiguous as a matter of law if it is capable of "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or

business." Id. [quoting Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F. Supp. 987, 994 (S.D.N.Y. 1968)].

By contrast, language that has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion," is unambiguous. Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) [quoting Breed v. Insurance Co. of North America, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 355 (1978)]. Contract language is not made ambiguous simply because the parties urge different interpretations. Wards Co., Inc. v. Stamford Ridgeway Assoc., 761 F.2d 117, 120 (2d Cir. 1985). Nor does ambiguity exist where one party's view "strain[s] the contract language beyond its reasonable and ordinary meaning." Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 141 N.E.2d 590, 593, 161 N.Y.S.2d 90, 92 (1957).

## B.    California Contract Interpretation Law.

California law concerning contract interpretation is essentially identical to New York law. Whether language in a contract is ambiguous is a question of law to be answered by the court. Producers Dairy Delivery Co. v. Sentry Ins. Co., 41 Cal.3d 903, 904, 226 Cal. Rptr. 558, 718 P.2d 920 (1986). California law provides that where a contract is unambiguous, the construction of the agreement is a question of law for the Court. United States Leasing Corp. v. DuPont, 69 Cal. 2d 275, 284, 70 Cal. Rptr. 393, 444 P.2d 65 (1968); Larsen v. Johannes, 7 Cal. App. 3d 491, 500, 86 Cal. Rptr. 744 (1970). Contractual language is ambiguous if it is susceptible of more than one reasonable interpretation in the context of the contract as a whole. MacKinnon v. Truck Ins. Exchange, 31 Cal.4th 635, 648 (2003). Contract interpretation, including the resolution of any ambiguity, is solely a judicial function, unless the interpretation turns on the credibility of extrinsic evidence. Parsons v. Bristol Development Co., 62 Cal.2d 861, 865 (1965).

"The interpretation of a contract is a question of law when the contract terms are unambiguous. However, when extrinsic evidence is required to determine the intent of the parties to the contract, the interpretation becomes a question of fact for the trier of fact." Abifadel v. Cigna Ins. Co., 8 Cal.App. 4th 145, 159, 9 Cal. Rptr. 2d 910 (Cal.App. 2d Dist.1992)

## C.    Pennsylvania Contract Interpretation Law.

"In construing a contract, a court's paramount consideration is the intent of the parties." Id. [quoting O'Farrell v. Steel City Piping Co., 266 Pa. Super. 219, 403 A.2d 1319, 1324 (Pa. Super. Ct. 1979)]; see also Glen-Gery Corp. v. Warfel Constr. Co., 1999 Pa.Super 175, 734 A.2d 926, 929 (Pa.Super. Ct. 1999). Pennsylvania follows the plain meaning rule of contract interpretation, such that "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone.  It speaks for itself and a meaning cannot be given to it other than that expressed." Sloan & Co. v. Liberty Mut. Co., 653 F.3d 175, 180 (3d Cir. 2011) [quoting Steuart v. McChesney, 444 A.2d 659, 661, 498 Pa. 45 (Pa. 1982)].

## POINT IV

### THE 2013 TRANSPORTATION CONTRACT
### UNAMBIGUOUSLY SUPERSEDES THE 2007 SERVICE AGREEMENT

## A.    The 2013 Contract Expressly Supersedes All Prior Agreements.

Like its 2012 predecessor contract (Exhibit "13"), the relevant 2013 Sections A, B and C transportation contract (Exhibit "14") states, in pertinent part, "This agreement supersedes any previous agreements, written or oral, between ECM Transport, LLC and [Ingram Micro]." The word "supersede" means to "set aside," "annul," "displace," "make void," and "repeal." City of Los Angeles v. Gurdane, 59 F.2d 161, 163 (9th Cir. 1932); 83 C.J.S. Supersede 888-89; Black's Law Dictionary, 1607 (rev. 4th ed. 1968).

"When parties to a contract enter into a new agreement that expressly supersedes a previous contract, the latter is extinguished, thus limiting the remedy for breach to a suit on the new agreement." Protective Closures Co. v. Clover Industries, Inc., 394 F.2d 809, 812 (2d Cir. 1968); Health-Chem Corp. v. Baker, 915 F.2d 805, 811 (2nd Cir 1990) [enforcing a settlement where "the Settlement Agreement subsequently entered into provides that it embodies the entire agreement and supersedes all prior agreements and understandings..."]; Air Support International, Inc. v. Atlas Air, Inc., 54 F.Supp.2d 158, 166 (E.D.N.Y. 1999) [enforced language in second contract reciting that it "supersedes any and all previous Agreements between the parties" and held it superseded any other existing agreements]; Citigifts, Inc. v. Pechnik, 112 A.D.2d 832, 833, 492 N.Y.S.2d 752 (1985) (mem.), aff'd mem., 67 N.Y.2d 774, 500 N.Y.S.2d 643 (1986) [holding second contract superseded first contract where "the terms of this second contract were substantially the same as the first, except that the schedule of payments was changed and it included the sentence: 'This agreement supersedes any concurrent or previously signed documents.'"]; Northville Indus. Corp. v. Fort Neck Oil Terminals Corp., 100 A.D.2d 865, 866-867, 474 N.Y.S.2d 122 (2nd Dept. 1984) (mem.), aff'd mem., 64 N.Y.2d 930, 488 N.Y.S.2d 648 (1985) [holding second contract stating "This Agreement shall be in lieu of and shall supersede any other agreements existing as of the date hereof between Fort Neck or Slomin's and Northville relating to the purchase by Northville of No. 2 heating oil" supplanted prior agreement]; Kreiss v. McCown De Leeuw & Co, 37 F.Supp.2d 294, 301 (S.D.N.Y. 1999) [holding that even if initial "Term Sheet could be deemed a valid contract, its promises of equity and stock options were superseded by the later executed Stockholders Agreement..." that contained a clause which states: "This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior arrangements or understandings . . . with respect thereto."]

9

The same result is reached under California law.   See, <u>Bhari Information Technology Systems Pvt. Ltd. v. Allied Boston Bank, Inc.</u>, 2005 U.S. Dist. Lexis 40094, *6-7 (N.D.Cal. 2005) [ "the August 9, 2002 Line of Credit…is the operative contract, because…that Agreement <u>states that it supersedes any prior oral or written agreements</u> (emphasis added)"]; <u>Business Integration Technology v. Mulesoft Inc.</u>, 2011 U.S. Dist. Lexis 136080, *26-28 (N.D. Cal. 2011) [held Reseller Agreement superseded alleged partnership agreement where former stated, "This Agreement is the complete and exclusive statement of the mutual understanding of the parties <u>and supersedes and cancels all previous written and oral agreements</u> and communications relating to the subject matter of this Agreement (emphasis added)"].

The California cases are consistent with the California parol evidence rule, Code of Civil Procedure s 1856, and California Civil Code § 1625 which states, in pertinent part:

> The execution of a contract in writing, whether the law requires it
> to be written or not, supersedes all the negotiations or stipulations
> concerning its matter which preceded or accompanied the execution
> of the instrument.

Pennsylvania case law is similarly consistent on this issue.  <u>Volunteer Firemen's Ins. Servs., Inc. v. Fuller</u>, 2012 U.S. Dist. LEXIS 181215, *17-18, *29 (M.D. Pa. 2012) [holding Employment Agreement stating "[t]his Agreement supercedes all prior agreements, understandings, discussions, or negotiations relating to this subject matter and covered matters of Fuller's employment and post-employment obligations, supersedes all prior agreements relating to the same subject matter"]; <u>Amerisource Bergen Drug Corp. v. Ciolino Pharm. Wholesale Distributors</u>, 2011 U.S. Dist. LEXIS 55423, *5-6 (E.D.Pa. 2011) [holding Supply Agreement expressly stating it "supercedes prior oral or written  agreements by the parties that relate to its subject matter," replaced prior Credit Agreement where subject matter of both agreements was

10

sale of pharmaceuticals]; <u>Smith v. Normandy Props., LLC.</u>, 2007 U.S. Dist. LEXIS 77752 (W.D. Pa 2007) [holding Employee Information Handbook that "supercedes all previous Company policies, programs and benefits, both written and unwritten" made arbitration provisions in prior agreements unenforceable].

 Other jurisdictions have held likewise.  See <u>Verizon New Jersey Inc. v DMJM Harris</u>, 2009 U.S. Dist. LEXIS 37678 (N.J. 2009) [where later agreements expressly superseded prior agreement, venue provisions in prior agreement held unenforceable]; <u>Armor Holdings Inc., v. Jim Layman & Associates, LLC</u>, 2006 U.S. Dist. LEXIS 18640 (W.D. Mich. 2006) [covenant not to compete entered into by sales representatives held unenforceable where subsequent termination agreement stated it "supersedes all other written or verbal agreements between the parties"]; <u>Archambo v. Lawyers Title Ins. Co.</u>, 466 Mich. 402, 414 n.16, 646 N.W.2d 170, 177 n.16 (2002) ["Where the later contract contains an integration clause, it cannot be said that the later contract does not supersede the earlier contract on the basis that this is not what the parties intended. Obviously, in such a situation, the integration clause provides clear evidence to the contrary, i.e., that the parties *did* intend the later contract to supersede the earlier contract. Therefore, the existence of an integration clause in the later contract necessarily indicates that the parties intended the later contract to supersede the earlier contract, and thus provides dispositive evidence with regard to which contract is controlling."].

 Like the parties' preceding 2012 transportation contract (Exhibit "13"), the relevant 2013 transportation contract (Exhibit "14") replaced all previous agreements between INGRAM MICRO and ECM TRANSPORT, including the old 2007 Service Agreement.  The 2013 contract expressly and unambiguously states, "This agreement <u>supersedes any previous agreements,</u> written or oral, between ECM Transport, LLC and [INGRAM]."  The 2013 transportation contract should be enforced as the only controlling contact between the parties.  Courts do not "create for the

parties a contract that they did not make and cannot insert language that one party now wishes for there." Holguin v. Dish Network LLC, 229 Cal. App. 4th 1310, 1324, 178 Cal. Rptr. 3d 100 (2014).

## B. A Subsequent Contract Supersedes a Prior Contract Covering the Same Subject Matter.

Generally, under New York law "a subsequent contract regarding the same subject matter supersedes the prior contract." Independent Energy Corp. v. Trigen Energy Corp., 944 F.Supp. 1184, 1195-96 (S.D.N.Y. 1996) [citing Bauman v. Millbrook Care Ltd. Partnership, 850 F.Supp. 1227, 1236 (S.D.N.Y. 1994)]. A subsequent agreement supersedes only those terms of the earlier contract that are of the same subject matter. Kreiss v. McCown De Leeuw & Co, 37 F.Supp.2d 294 (S.D.N.Y. 1999) [where subject matter of subsequent agreement did not cover award of equity and stock options, it did not supersede prior agreement].

California law similarly provides that a subsequent written contract supersedes a prior written contract. Crossen v. Foremost-McKesson, Inc., 537 F. Supp. 1076 (N.D. Cal. 1982) ["Here, the 1977 alteration of the notice requirement, supercedes the language in the 1974 agreement referring to Foremost's personnel policies"]; Crain v. Burroughs Corp., 560 F. Supp. 849, 852 (C.D.Cal. 1982) ["Therefore the employment contract in existence at the time of Plaintiff's termination, by its own terms as well as by law, supersedes all prior contracts between Plaintiff and Burroughs and is dispositive as to the terms and conditions of Plaintiff's employment."].

Pennsylvania law is to the same effect. Joseph M. Coleman & Assocs. v. Colonial Metals Co., 1996 U.S. Dist. LEXIS 8901, *16-17 (E.D.Pa. 1996) ["A comparison of the two agreements also convinces the court that ... the April 1993 agreement was intended to supersede the December 1988 agreement, to the extent the December 1988 agreement was still in effect. Where a subject matter has been addressed by the parties in a written contract,

12

prior written agreements as to the same subjects are merged in or superseded by the written contract."] [citing Restatement (Second) of Contracts, § 213.]

Similarly, in United States ex rel. International Contracting Co. v. Lamont, 155 U.S. 303, 309, 39 L. Ed. 160, 15 S. Ct. 97 (1884), the Supreme Court concluded that a private contractor effected an abandonment of its rights against the government under a first contract by agreeing to a second contract which called for the performance of the same work at a lower fee. See also Mitsubishi Aircraft International, Inc. v. Brady, 780 F.2d 1199, 1202 (5th Cir. 1986) [execution of second agreement effected an "unconditional rescission" of first agreement covering same subject matter, notwithstanding the lack of an explicit release]; Cooperative Refinery Ass'n. v. Consumers Public Power District, 190 F.2d 852, 857, 859 (8th Cir. 1951) [legal effect of uncontingent contract is implied rescission of another prior one covering same subject matter, despite an intention by one of the parties that the original contract remain in force].

INGRAM MICRO's old 2007 Service Agreement states (Exhibit "3"), in pertinent part:

> 15.2    In the event of loss and/or damage to any shipment, CARRIERS liability will not exceed $50 per pound per item(s) lost or damaged, subject to a maximum liability of $250,000 per shipment, unless SHIPPER has requested excess liability coverage.
>
> 15.3.  Breach of security, willful misconduct, and/or employee theft will be subject to the full replacement value of the product.

As INGRAM MICRO's Vice President Transportation, Jeffrey Johnson, acknowledged in his deposition, the $100,000 motor carrier liability limitation in the 2012 and 2013 transportation contracts replaced the 2007 Service Agreement's carrier liability provisions. The parties' 2012 and 2013 contracts' Section B (**General Terms and Charges**) contain new negotiated carrier liability terms that simply state:

> **Released Value**: Carrier will not be liable for losses in excess of
> $100,000.

The "release value" of a shipped item is its declared value, that is, the value at which the shipper

releases it to the carrier for transportation. National Small Shipments Traffic Conf. v. United

States, 887 F.2d 443, 444 (3d Cir. 1989).

INGRAM MICRO admits that it agreed to reduce ECM's released value cargo

liability limitation to $100,000 in 2012 and 2013 because of ECM's unblemished service record

and lack of claims. INGRAM now conveniently argues that it only meant for the $100,000 limit

to replace the old 2007 contract's $250,000 limit in Section 15.2, but not the Section 15.3 full

replacement value term. However, nothing in the 2007, 2012 or 2013 contracts' liability terms

supports INGRAM's theory. INGRAM MICRO'S contention is meritless.

First, the preceding 2012 and the applicable 2013 contracts' $100,000 carrier

liability limitation plainly covers all cargo losses *without exception*. Second, INGRAM had ample

opportunity to amend the 2012 and 2013 contracts' $100,000 limitation to clarify that it only

modified Section 15.2, not Section 15.3, of the old 2007 Service Agreement, but INGRAM did

not do so. Third, like all of INGRAM's other contracts, the governing 2013 contract was reviewed

and approved by its Legal Department before being executed by its Vice President Jeffrey Johnson.

Whether or not the entire 2007 Service Agreement is held to have been superseded

by the 2013 transportation contract, it is clear that the 2007 Service Agreement's $250,000 and

"full replacement value" liability provisions were superseded by the 2013 contract's broad and

unconditional $100,000.00 limitation of ECM's cargo liability.

## C. The 2013 Contract is An Integrated Agreement.

In addition to the fact that the 2013 Agreement contains an integration clause, the

contract as a whole appears to be complete on its face. Among other things, it prescribes a 14-day

termination period, identifies all shipping routes and rates and specifies ECM's released value liability limitation. <u>Sicor Ltd. v. Cetus Corp.</u> 51 F.3d. 848 (9th Cir. 1995) ["To determine whether a document is an integrated contract not susceptible to modification by parol evidence under California law, we must consider [in addition to the inclusion of an integration provision, among other factors] the language and completeness of the written agreement"].

**POINT V**

**ECM'S $100,000 LIMITATION OF LIABILITY IS VALID**

The subject shipment was picked up by ECM from INGRAM MICRO in Jonestown, Pennsylvania for delivery to a consignee in Chicago, Illinois. Therefore, the ICC Termination Act of 1995 ("ICCTA"), Carmack Amendment, 49 U.S.C. § 14706, governs plaintiffs' claims. Section 14706 (c)(1)(A) authorizes an interstate motor carrier to:

> ... establish rates for the transportation of property...under which the liability of the carrier for such property is limited to a value established by written...declaration of the shipper or by **written agreement between the carrier and shipper** if that value would be reasonable under the circumstances surrounding the transportation (emphasis added).

**A. Established Case Law Holds That Carrier
Limitations of Liability Are Enforceable.**

The relevant negotiated 2013 Sections A, B and C transportation contract (Exhibit "14") plainly limits ECM's maximum liability for cargo loss to $100,000.00. INGRAM MICRO's Vice President Transportation Jeffrey Johnson testified that plaintiffs' agreed to the $100,000.00 limitation because of ECM's spotless claim history before the loss. The 2013 contract further provides for a basic freight rate of $1,036.00 for the 693-mile route from Jonestown to Vernon Hills, approximately $1.49 per mile, including fuel surcharges. The 2013 contract does not provide for any additional property valuation or cargo security charges payable to ECM because, as a conscious business decision, INGRAM did not want to pay for any such extra charges.

As a large, sophisticated commercial shipper, INGRAM MICRO usually issued its own standard form Straight Bill of Lading to ECM and other truckers for all shipments, including the one at issue. INGRAM's standard Bill of Lading contains a blank space giving it the option to declare values on its shipments, if it elects to do so. The Courts enforce carriers' contractual limitations of liability because they reflect the realities of commercial transportation. In return for offering shippers lower freight rates, carriers may limit their liability for cargo loss or damage to agreed amounts.

Well over a century ago, the United States Supreme Court explained the commercial justification for enforcing carriers' contractual limitations of liability in <u>Hart v. Pennsylvania R.R. Co.</u>, 112 U.S. 331, 340, 5 S.Ct. 151, 28 L.Ed. 717 (1884):

> ...There is no justice in allowing the shipper to be paid a large value for an article which he has induced the carrier to take at a low rate of freight on the assertion and agreement that its value is a less sum than that claimed after a loss. It is just to hold the shipper to his agreement, fairly made, as to value, even where the loss or injury has occurred through the negligence of the carrier....

Several years later, the Supreme Court held in <u>George N. Pierce Co. v. Wells, Fargo & Co.</u>, 236 U.S. 278, 284, 59 L.Ed. 576, 35 S.Ct. 351 (1915):

> The valuation declared or agreed upon as evidenced by the contract of shipment upon which the published tariff rate is applied, must be conclusive in an action to recover for loss or damage a greater sum... . To permit such a declared valuation to be overthrown by evidence *aliunde* the contract, for the purpose of enabling the shipper to obtain a recovery in a suit for loss or damage in excess of the maximum valuation thus fixed, would both encourage and reward undervaluations and bring about preferences and discriminations forbidden by the law. Such a result would neither be just nor conducive to sound morals or wise policies.

Before the abolition of interstate motor carrier filed tariffs by the TIRRA[2] statute in 1994 and the enactment of ICCTA in 1996, an interstate motor carrier could limit its liability for cargo loss if it satisfied a four-part test set forth in the Seventh Circuit's 1987 pre-ICCTA decision, Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1415 (7th Cir. 1987). If a carrier failed to meet the four-step Hughes test, it could be held liable for full actual loss or injury to the property pursuant to the former 49 U.S.C. § 11707(a)(1). The four-part Hughes test placed the burden on the carrier to prove that it: (1) maintained a tariff within the prescribed guidelines of the Interstate Commerce Commission;[3] (2) obtained the shipper's agreement as to its choice of liability; (3) gave the shipper a reasonable or fair opportunity to choose between two or more levels of liability; and (4) issued a receipt or bill of lading before accepting moving the shipment. Emerson Elec. Supply Co. v. Estes Express Lines Corp., 451 F.3d 179, 186 (3d Cir. 2006).

Neither Carmack nor the Hughes test was designed to protect large commercial shippers, like INGRAM MICRO, from smaller trucking companies, like ECM.[4] Even assuming, for purposes of this motion, that the Hughes test applies to the governing 2013 transportation contract (Exhibit "14") between INGRAM and ECM, both Carmack and Hughes are satisfied by the 2013 contract. The 2013 transportation contract's $100,000 released value limitation complies with Sec. 14706(c)(1)(A) which authorizes a motor carrier to establish rates and cargo values "by written agreement between the carrier and shipper."

---

[2] Trucking Industry Regulatory Reform Act of 1994.

[3] Under ICCTA, a carrier is only required to make any tariffs it may have available upon the shipper's request. OneBeacon Insurance Company v. Haas Industries, Inc., 634 F.3d 1092, 2011 U.S.App. Lexis 4603 (9th Cir. 2011); Emerson Electric Supply Co. v. Estes Express Lines Corp., 451 F.3d 179, 187 n.6 (3d Cir. 2006); Sassy Doll Creations, Inc. v. Watkins Motor Lines, 331 F.3d 834, 841 (11th Cir. 2003).

[4] Siren v. Estes Express Lines Corp., 249 F.3d 1268, 1271 (11th Cir. 2001) [Carmack's purpose is to protect unwary shippers from carriers with superior leverage and it is not "necessary to protect shippers from themselves"].

17

Federal courts have held that parties who draft their own agreements, or enter into negotiated agreements containing carrier liability limitations are bound by them. Mechanical Technology, Inc. v. Ryder Truck Lines, 766 F.2d 1085, 1087-1089 (2d Cir. 1985) [sophisticated shipper bound by its own bill of lading where "the shipping contract was negotiated between people of at least equal economic statute and commercial awareness or acuity...Having had the opportunity on its own form to secure greater protection, the shipper 'cannot complain about the consequences of leaving the applicable spaces blank ....'"] Siren v. Estes Express Lines Corp., 249 F.3d 1268, 1274 (11th Cir. 2001) ["when a shipper drafts a bill of lading, incorporating language which is universally understood throughout the motor carrier industry to limit the liability of the carrier, said shipper will be bound by the terms of the contract, irrespective of whether the shipper had actual knowledge of the limiting aspect of those terms"]; Hughes Aircraft Co. v. N. Am. Van Lines Inc., 970 F.2d 609, 612 (9th Cir. 1992) ("Hughes had ... reasonable notice and an opportunity to make a deliberate, thoughtful choice in selecting North American's liability limit because it drafted the contract and directly negotiated its terms."); Swift Textiles, Inc., v. Watkins Motor Lines, Inc., 799 F.2d 697, 703 (11th Cir. 1986) ["If the shipper's agent thereby incorporated an industry-wide, indisputably legal, and federally sanctioned statute of limitations, the shipper cannot now be heard to complain about it"]; Nipponkoa Insurance Co. Ltd. v. Watkins Motor Lines, Inc., 431 F.Supp.2d 411, 416 (S.D.N.Y. 2006) [holding that a limitation of liability provision in a written transportation agreement was valid under the Carmack Amendment]; EFS National Bank v. Averitt Express, Inc., 164 F.Supp.2d 994 (W.D. Ten. 2001) [holding Carmack's requirements satisfied because shipper had opportunity to declare value on bill of lading noting carrier's liability may be limited]; Schweitzer Aircraft Corp. v. Landstar Ranger, Inc., 114 F.Supp.2d 199, 203 (W.D.N.Y. 2000) [following Mechanical Technology, enforced bill of lading terms against shipper suing under own bill and opting to obtain insurance in lieu of declaring value to motor carrier and paying higher shipping rate]; Neiman Marcus Group, Inc.

18

v. Quast Transfer, Inc., 1999 U.S. Dist. Lexis 9564, 1999 WL 436589, *4 (N.D .Ill. 1999) [acknowledging that "since the statutory scheme no longer contains a provision regarding offering different rates for different levels of liability limitation, it is unclear whether providing a reasonable opportunity to choose between levels of liability should still be a requirement for enforcing a limitation liability"]; see also Ingram Micro, Inc. v. Airoute Cargo Express, Inc., 154 F.Supp.2d 834, 842-844 (S.D.N.Y. 2001) [applying federal common law and holding that Airoute's limitation was enforceable where Ingram was aware of the limitation, purchased separate insurance, and because of its "status as a sophisticated shipper of goods."].

The relevant 2013 transportation contract (Exhibit "14") contains a freely-negotiated $100,000.00 limitation of ECM's liability for the subject loss and that limitation should be enforced.

## POINT VI

### IF THE 2007 SERVICE AGREEMENT APPLIES, ECM'S LIABILITY SHOULD NOT EXCEED $250,000

The old 2007 Service Agreement (Exhibit "3") states, in pertinent part:

15.2    In the event of loss and/or damage to any shipment, CARRIERS liability will not exceed $50 per pound per item(s) lost and/or damaged, subject to the maximum liability of $250,000 per shipment, unless SHIPPER has requested excess liability coverage.

15.3 Breach of security, willful misconduct, and/or employee theft will be subject to the full replacement value of the product.

Paragraph 15.2 clearly limits ECM's liability to $50 per pound per item, up to a maximum of $250,000 per shipment -- unless INGRAM MICRO requests "excess liability coverage." INGRAM never requested "excess liability coverage" for any shipments it tendered to ECM. Thus, ECM's liability should not exceed $250,000 if the 2007 Agreement is held applicable. As discussed below, Section 15.3 is not applicable to this action.

19

## POINT VII

### IF THE 2007 SERVICE AGREEMENT APPLIES, PLAINTIFFS MAY NOT RECOVER FULL REPLACEMENT VALUE UNLESS THEY ESTABLISH THE LOSS WAS CAUSED BY ECM'S FAILURE TO COMPLY WITH THE "MINIMUM SECURITY GUIDELINES"

Plaintiffs contend that, merely because the loss was caused by a theft, they are entitled to recover the full replacement value of the goods under Paragraph 15.3. Paragraph 15.3 states, in pertinent part:

> 15.3 Breach of security, willful misconduct, and/or employee theft
> will be subject to the full replacement value of the product.

Plaintiffs' proposed reading of Paragraph 15.3 is overreaching. Paragraph 15.3 states three (3) conditions under which INGRAM MICRO may recover a shipment's "full replacement value." "Breach of security, willful misconduct and/or employee theft...." If INGRAM meant to encompass all thefts within the undefined phrase "breach of security," it could have simply used the single word "theft" instead of the murky phrase "breach of security." Moreover, if INGRAM intended "breach of security" to cover all thefts of any kind, it would not have included "employee theft" because it would be redundant and superfluous. It follows that "breach of security" was obviously intended by INGRAM to mean something far more specific and limited than "all thefts."

Considering the old 2007 Service Agreement as a whole, it is evident that the phrase "breach of security" could only refer to the "Minimum Security Guidelines" set forth in Paragraph 13.0 of the Agreement. Paragraph 13.0 (SECURITY) enumerates specified "Minimum Security Guidelines" in subsections 13.1 through 13.25. Paragraph 13.0 is the only part of the 2007 Agreement that pertains to security. Thus, the phrase "breach of security" must be read as a reference to Paragraph 13. JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009) ["In interpreting an unambiguous contract, the court is to consider its [p]articular words not in isolation

but in the light of the obligation as a whole..."]; Prudential Insurance Company of America v. Barnes, 285 F.2d 299, 301 (9th Cir. 1960) ["What controls is not the interpretation of individual words which are not defined in the policy itself, but the interpretation which the ordinary man would give to the phrase as a whole taken in the context of the whole policy...."]; Pantone, Inc. v. Esselte Letraset Ltd., 691 F. Supp. 768, 771 (S.D.N.Y. 1998) ["The intention of the parties must be gleaned from all corners of the documents, rather than from sentences or clauses viewed in isolation."]

INGRAM MICRO's Vice-President Transportation Jeffrey Johnson testified that the phrase "breach of security" in the old 2007 Service Agreement is undefined. Thus, that phrase has no meaning beyond subsections 13.1 through 13.25. INGRAM's phrase "breach of security" is ambiguous at best. Both New York and California law hold that ambiguity in a contract is construed against the drafter. When an uncertainty remains, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Medical Sales & Consulting Group v. Plus Orthoped..., 2011 U.S. Dist. LEXIS 123497, *18-19 (S.D. Cal. 2011); Miller v. United States, 363 F.3d 999, 1006 (9th Cir. 2004) ("[W]here a contract is ambiguous, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist," *i.e.*, the drafter); 151 West Associates v. Printsiples Fabric Corp., 61 N.Y.2d 732, 734, 472 N.Y.S.2d 909 (1984) ["It has long been the rule that ambiguities in a contractual instrument will be resolved *contra proferentem*, against the party who prepared or presented it. Taylor v United States Cas. Co., 269 N.Y. 360, 364 (1936); Gross v. Sweet, 49 N.Y.2d 102, 106-107, 424 N.Y.S.2d 365 (1979); Ciofalo v Vic Tanney Gyms, 10 N.Y.2d 294, 297 (1961).

The phrase "breach of security" in the old 2007 Service Agreement, if it applies, should be construed as limited to the "Minimum Security Guidelines" in Paragraph 13.0. Thus,

plaintiffs may recover the full replacement value of the shipment only if they establish that the loss

was actually caused by ECM's failure to comply with one of the "Guidelines."

## POINT VIII

### ECM DID NOT BREACH THE
### "MINIMUM SECURITY GUIDELINES"

**A.    Subsection 13.1 of the 2007 Service Agreement is Not a Specific Security Requirement But Merely Unenforceable Prefatory Language.**

Paragraph 13.1 states, in pertinent part:

13.0    SECURITY

The following Minimum Security guidelines must be met to ensure the safety of SHIPPER'S product and employee integrity.

13.1    CARRIER agrees to use its best efforts to implement the SHIPPER'S Minimum Security Guidelines.    CARRIER shall follow generally accepted practices and take all reasonable precautions to protect SHIPPER'S assets.  CARRIER agrees to ensure a level of security as set forth in this agreement at all times.

SHIPPER may issue a written waiver to a requirement that is not applicable, or deemed impractical or unnecessary.  However, the CARRIER must use its best efforts to comply with all requirements in this appendix that are not waived in writing.

\*\*\*

Plaintiffs contend that Paragraph 13.1 is an independent mandate that ECM "follow

generally accepted practices and take all reasonable precautions" to protect [INGRAM's] assets."

The latter terms, however, are not an enforceable security rule, but merely general prefatory

language. Aho v. Cleveland-Cliffs, Inc., 219 Fed. Appx. 419, 423, 219 Fed. Appx. 419, 2007 U.S.

App. LEXIS 5592 (6th Cir. 2007) ["… prefatory language cannot, in and of itself, create binding

contract obligations…"].    The purported requirement of Subsection 13.1 that ECM follow

"generally accepted practices and take all reasonable precautions" is sandwiched between other

sentences containing bland, introductory language entreating ECM to "use its best efforts to

implement the… <u>Minimum Security Guidelines</u>" and "use its best efforts to comply with all requirements…." The third sentence of Subsection 13.1 merely recites that ECM will "ensure a level of security" reflected in the "Minimum Security Guidelines." Obviously, the limited purpose of subsection 13.1 is only to introduce the "Minimum Security Guidelines."

To the extent that subsection 13.1 supports any additional obligations, they could only be based on subsections 13.2 to 13.25. Subsection 13.1 requires ECM to "follow generally accepted practices and take all reasonable precautions" in implementing the "Minimum Security Guidelines," that is, subsections 13.2 to 13.25. Such an interpretation is consistent with the sound principle that courts construing contracts must give specific and exact terms greater weight than general language. <u>County of Suffolk v. Alcorn</u>, 266 F.3d 131, 139 (2nd Cir. 2011). "Specific words will limit the meaning of general words if it appears from the whole contract that the parties' purpose was directed solely toward the matter to which the specific words or clause relate." <u>Aramony v. United Way of America</u>, 254 F.3d 403, 413-414 (2d Cir. 2001).

The general language of subsection 13.1 is limited by the specific terms of subsections 13.2 through 13.25. If the old 2007 Service Agreement applies at all, plaintiffs may recover the full replacement value of the shipment only if they establish that ECM committed a breach of subsections 13.2 through 13.25 that actually caused in the loss. Alternatively, if the Court determines that Subsection 13.1 creates any independent duty on the part of ECM to INGRAM MICRO, ECM will establish at trial through expert testimony that its security practices at the subject facility were "generally accepted" and "reasonable" consistent with local motor carrier industry standards in the Pittsburgh area (Exhibit "53").

**B.    The Other "Minimum Security Guidelines" Subsections
13.2 to 13.25 Are Not Causally Related to the Loss.**

The "Minimum Security Guidelines" are conspicuously silent with respect to physical security protocols at ECM's truck yards.  For example, they say nothing about gates, guards, locks or video surveillance.  The "Minimum Security Guidelines" address the process for implementing the guidelines, adding INGRAM as an insurance certificate holder, administrative paperwork, DOT safety requirements, employee background checks, scheduling of deliveries, routes and stops, accounting of pieces, loss reporting, and equipment requirements.  As discussed below, however, none of the "red herring" provisions in subsections 13.2 to 13.25 have the slightest causal connection whatever to the subject loss.

ECM's alleged non-compliance with the "Guidelines" is entirely irrelevant because they are mostly procedural and reporting requirements.  Any violation of a "Guideline" did not cause the subject loss and, thus, is not actionable.  Rich v. Shrader, 2010 U.S. Dist. LEXIS 98267, *17 (S.D.Cal. 2010) ["Defendants attack the breach of contract claim for failing to show that the breach was the proximate cause of Plaintiff's damage. A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage…Defendants' position is well taken."].  Significantly, INGRAM MICRO failed to take any steps to implement or enforce the "Guidelines" during its seven-year business relationship with ECM.  That fact is substantial evidence on which a jury could conclude that INGRAM did not consider its old 2007 Service Agreement as controlling, at least not until after the loss.

(1)    Implementation of Security Guidelines:  Subsection 13.2 requires ECM to assign a senior security representative to integrate the "Minimal Security Guidelines" into ECM's security procedures.  Subsection 13.3 states that ECM will produce to INGRAM MICRO's transportation manager evidence of implementation of the security guidelines within (30) days of

24

the commencement of the agreement.    Subsection 13.21 required ECM to provide status reports to INGRAM of "all necessary security process and facility improvements." Finally, subsection 13.22 gives INGRAM the right to review security performance. Plaintiffs fail to establish that any breach of these reporting requirements resulted in the subject loss.

(2)    Insurance Certificate Holder:    Subsection 13.4 requires ECM to name INGRAM MICRO as a 'certificate holder' on all insurance policies...." A certificate of insurance is merely evidence that a policy has been issued. It is not a contract between the insurer and the certificate holder. Pardee Constr. Co. v. Ins. Co. of the West, 77 Cal. App. 4th 1340, 92 Cal. Rptr. 2d 443, 447 n.2 (Ct. App. 2000). It is significant that INGRAM did not require that it be named as an "additional insured" in any ECM policy. An "additional insured" is a person or organization that enjoys the benefits of being insured under an insurance policy, in addition to the party that purchased the insurance policy.    Black's Law Dictionary, 38 (6th ed. 1990); en.wikipedia.org/wiki/Additional_insured.

Aside from the facts that the term "certificate holder" has no legal significance and "all insurance policies" is extremely vague, INGRAM MICRO cannot show that issuance of an insurance certificate would have prevented the theft or affected plaintiffs' alleged economic loss in any way. Factory Mutual Insurance Co. v. Lexington Ins. Co., 2003 U.S. Dist. Lexis 2159 (W.D.Ky. 2003) [noting additional insureds under the cargo policy are "not seeking to recover under the liability policy insurance portion of this policy" because no coverage exists for an additional insured under such a policy]. INGRAM had its own first-party cargo insurance policy with plaintiff ROYAL & SUN ALLIANCE. Therefore, INGRAM had no need or expectation for ECM to insure INGRAM's interest in its own cargo. Moreover, the old 2007 Service Agreement required ECM to carry its own "cargo liability insurance" (Sec. 14) covering its potential liability to INGRAM. INGRAM Vice President Transportation Jeffrey Johnson testified that it never asked

ECM to obtain separate insurance coverage for any INGRAM freight. Therefore, INGRAM could not have believed that subsection 13.4 required ECM to procure any insurance policy naming INGRAM as a direct beneficiary or insured.

      (3)    <u>DOT Requirements</u>: Subsection 13.5 requires ECM to provide a copy of its U.S. Dept. of Transportation ("DOT") safety rating to INGRAM MICRO. Section 13.8 requires ECM's drivers to comply with the DOT's time log policy. These requirements are related to vehicle and driver safety, not cargo security. There is no allegation that ECM violated subsection 13.8. Furthermore, ECM's USDOT safety ratings are available to the public at safer.fmcsa.dot.gov.CompanySnapshot.aspx.

      (4)    <u>Employee Background Checks</u>: Subsections 13.6 and 13.7 require ECM's employees to be "drug tested and background checked" and have no record of felony criminal convictions. ECM's CEO Edward C. Meier testified that all his employees are background checked and ECM produced requested background check records for its involved driver. INGRAM MICRO frankly admits there is no evidence that any ECM employee was involved in the theft of the subject trailer, which was recovered in Miami, FL some 1,200 miles from ECM's facility.

      (5)    <u>Scheduling of Deliveries</u>: Subsections 13.9, 13.10 and 13.11 pertain to ECM's scheduling of deliveries with INGRAM MICRO'S customers and its customers' satisfaction with ECM's performance. There is no allegation that ECM violated these requirements or that such a violation could be the cause of the loss.

      (6)    <u>Rules Against Route Deviation, Stops and Storage</u>: Subsection 13.16 states that all transit will be "point to point" and the driver will not deviate from assigned routes or make unscheduled stops. Subsection 13.18 requires ECM to use "routes and schedules that are published and well traveled." Subsection 13.24 requires ECM to make deliveries "at the earliest possible

time and not to store freight." The evidence establishes that INGRAM MICRO and its Chicago customer routinely instructed ECM to hold shipments over weekends or longer, including the subject shipment. At the behest of INGRAM and its customer, ECM picked up the subject shipment on Saturday, August 17, 2013, from INGRAM's facility with its full knowledge that the trailer would not be delivered to its Chicago customer until Tuesday, August 20, 2013 (Exhibit "20"). INGRAM well knew that the trailer would be held by ECM through the weekend until its scheduled Tuesday delivery. Thus, ECM did not violate Subsections 13.16, 13.18 or 13.24.

(7)    Accounting of Pieces: Subsection 13.12 prohibits ECM from breaking down pallets without written authorization. Subsection 13.13 requires ECM to ensure that there is a piece count at every transfer point. Subsection 13.19 requires ECM to have a representative present when the shipment was loaded or unloaded. The stolen shipment did not involve broken down pallets, piece counts or monitoring of loading. No failure to comply with subsections 13.12, 13.13 or 13.19 is at issue.

(8)    Reporting of Loss: Subsections 13.14, 13.20, 13.23 and 13.25 require reporting of shortages, damage, tampering, overages, and refused or delayed deliveries. ECM reported the subject theft to INGRAM MICRO on August 20, 2013 within one (1) day after its discovery on August 19, 2013 (Exhibit "32"). These "Guidelines" have no causal nexus to the loss.

(9)    Equipment Requirements: Subsections 13.15 and 13.17 require ECM to provide trailers with solid sides and a suitable communications system allowing the driver to request assistance in the event of an emergency. The subject loss involved a professional gang of Miami-based cargo thieves who stole an entire tractor-trailer rig with a duplicate tractor key, took extensive measures to conceal the trailer's identifying marks and disposed of it over a thousand

miles from the crime scene.  This loss was not caused by any failure to comply with subsections 13.15 and 13.17.

Plaintiffs are not entitled to recover the shipment's full replacement value as they cannot establish that the loss was caused by ECM's breach of any "Minimum Security Guidelines."

## CONCLUSION

ECM's cross-motion for an Order (1) granting partial summary judgment limiting its liability to the maximum sum of $100,000.00 with respect to the subject cargo loss or, alternatively, (2) limiting its liability to the maximum sum of $250,000, should be granted in all respects.

Dated:  March 20, 2015

George W. Wright
_____
GEORGE W. WRIGHT

28