USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  Aug. 31, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
ROYAL & SUN ALLIANCE INSURANCE,     :
PLC, and INGRAM MICRO, INC.,        :
                                    :
                  Plaintiffs,       :
                                    :    No. 14 Civ. 3770 (JFK)
      -against-                     :
                                    :       **OPINION & ORDER**
E.C.M. TRANSPORT, INC., and         :
ECM TRANSPORT, LLC,                 :
                                    :
                  Defendants.       :
------------------------------------X

APPEARANCES

FOR PLAINTIFFS ROYAL & SUN ALLIANCE INSURANCE, PLC and INGRAM
MICRO, INC.:
      David Maloof, Esq.
      Thomas Eagan, Esq.

FOR DEFENDANTS E.C.M. TRANSPORT, INC., and ECM TRANSPORT, LLC:
      George W. Wright, Esq.
      Narinder S. Parmar, Esq.

**JOHN F. KEENAN, United States District Judge:**

Before the Court is a summary judgment motion by Plaintiffs

Royal & Sun Alliance Insurance, PLC ("Royal") and Ingram Micro,

Inc. ("Ingram"), seeking an award of damages in the amount of

$561,168.81 plus interest and costs.  In response, Defendants

E.C.M. Transport, Inc. and ECM Transport, LLC (together, "ECM")

cross-move for partial summary judgment, requesting an order

limiting their liability for the subject cargo loss to $100,000

under the terms of the parties' underlying services contract.

For the reasons discussed below, Plaintiffs' motion is granted

in part and denied in part, and Defendants' cross-motion is denied.

## I.    Background

The following facts and allegations are taken from the complaint dated May 28, 2014 and from the record following discovery.  This case concerns the theft of a shipment of computer parts belonging to Insured Plaintiff Ingram Micro, Inc. ("Ingram"), which was stolen on August 19, 2013 while being carried by a truck owned by the Defendants.  Ingram is a Delaware corporation registered to do business in New York and was the owner of the shipment that is the subject of this action.  Plaintiff Royal & Sun Alliance Insurance, PLC ("Royal"), which insured Ingram for the shipment at issue, is a British insurance corporation with its principal place of business in the United Kingdom.  Defendants E.C.M. Transport, Inc. and ECM Transport, LLC are Pennsylvania shipping companies that conduct business in New York.

On February 16, 2007, Ingram and ECM executed a Service Agreement (the "2007 Service Agreement"), which set forth the general terms by which ECM, as shipper and trucker, agreed to the door-to-door carriage of Ingram's products. (Decl. of Thomas M. Eagan ("Eagan Decl.") Ex. 3, the 2007 Service Agreement.) Among other provisions, subparagraph 15.2 of the 2007 Service Agreement provided that ECM's liability as an interstate common

motor carrier for lost or damaged shipments was limited to a
maximum of $250,000, although paragraph 15.3 stated that
"[b]reach of security, willful misconduct, and/or employee theft
[would] be subject to the full replacement value of the
product." (Id.)  In addition, paragraph 1.0 stated that ECM
would provide shipping services at the rates set forth in
"Addendum 'A', attached hereto and made a part hereof," while
paragraph 27.0 defined the parties' "Entire Agreement" as
consisting of the 2007 Service Agreement "and all Attachments
(Addenda) and documents referenced herein." (Id.)

     Shortly thereafter, on February 19, 2007, the parties
executed a pricing agreement (the "2007 Sheet"), setting forth
the freight charges that Ingram would pay ECM for specific
shipments. (Id. at 9.)  The 2007 Sheet also contained a merger
clause stating:  "This agreement, effective with the above
mentioned date, supersedes any previous agreements, written or
oral between ECM Transport, Inc. and the undersigned." (Id.)
Over the course of the next six years, the parties repeatedly
executed similar pricing agreements, all of which included
merger clauses akin to the one contained in the 2007 Sheet.
(Eagan Decl. Exs. 4-14.)

     On September 17, 2012, ECM sent an email to Ingram noting
that Ingram's "rates had expired in February" and asking them to
sign and return the attached "updated rate agreement." (Eagan

3

Decl. Ex. 22.)  This new agreement (hereinafter, the "2013 Schedule") was executed by Ingram on July 31, 2013. (Eagan Decl. Ex. 14.)  Among other provisions, Section A of the 2013 Schedule contained a merger clause stating that the agreement "supersede[d] any previous agreements, written or oral, between ECM Transport, LLC and [Ingram]." (Id.)  In addition, Section B included a "Released Value" provision, providing that ECM would "not be liable for losses in excess of $100,000." (Id.)

On Friday, August 16, 2013, ECM accepted from Ingram a shipment containing computer parts (the "Shipment"), which it agreed to transport from Jonestown, Pennsylvania to Vernon Hills, Illinois. (See Eagan Decl. Exs. 33-34.)  Shortly after being picked up, the Shipment was brought to a yard managed by ECM in New Kensington, Pennsylvania, where it was kept over the weekend. (Defs.' Answer ¶ 10; Eagan Decl. Ex. 41, Dep. of Edward C. Meier ("Meier Dep.") 59:3-60:24.)  During this time, the gate to the yard was left open and the car and trailer were left unattended by the driver. (Meier Dep. 59:18-60:7, 81:8-17.)  The shipment was subsequently stolen from the New Kensington yard on Sunday, August 18, 2013. (Defs.' Answer ¶ 10.)  Thereafter, Plaintiffs brought this action against ECM in order to recover for the loss of the Shipment.

Following the completion of discovery, Plaintiffs filed their present motion for summary judgment on February 13, 2015.

In response, Defendants cross-moved for partial summary judgment on March 20, 2015.  Oral Argument was held on June 25, 2015.

## II.  Discussion

### A. Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If, "as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).  By comparison, if "no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir.1994).

When cross motions for summary judgment are made, the standard is the same as that for individual motions. See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir.2001).  The court must consider each motion independently of the other and,

5

when evaluating each, must weigh the facts in the light most favorable to the non-moving party. Id. at 121.  However, where the motion and cross motion seek a determination of the same issue, the Court may address them together. See Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014).

### B. Analysis

The Carmack Amendment, codified as amended at 49 U.S.C. § 14706, provides shippers with a federal statutory right to recover against carriers for goods lost or damaged during interstate shipment under a valid bill of lading. See Active Media Servs., Inc. v. CAC Am. Cargo Corp., No. 08 Civ. 6301, 2012 WL 4462031, at *2 (S.D.N.Y. Spe.t 26, 2012); Commercial Union Ins. Co. v. Forward Air, Inc., 50 F. Supp. 2d 255, 257 (S.D.N.Y. 1999).  The statute defines "carrier" as a "motor carrier, a water carrier, and a freight forwarder." 49 U.S.C. § 13102(3).

Where a shipper seeks to recover against a carrier for the loss of goods during an interstate shipment, the Carmack Amendment supplies "the sole remedy for damages." See Great Am. Ins. Co. of N.Y. v. TA Operating Corp., No. 06 Civ. 13230, 2008 WL 5335317, at * 4 (S.D.N.Y. Dec. 8, 2008); see also Active Media Servs., Inc., 2012 WL 4462031, at *2 (noting that the Carmack Amendment "'has long been interpreted to preempt state

liability rules pertaining to cargo carriage, either under statute or common law.'" (quoting 5K Logistics, Inc. v. Daily Exp., Inc., 659 F.3d 331, 335 (4th Cir.2011)).  Likewise, where a carrier attempts to limit a shipper's recovery under the Carmack Amendment by invoking a limitation of liability provision contained in an agreement between the parties, courts apply federal common law to determine the validity of that limitation. See Great Am. Ins. Co. of N.Y., 2008 WL 5335317, at *4 (citing Nippon Fire & Marine Ins. Co. Ltd. v. Skyway Freight Sys. Inc., 235 F.3d 53, 60 (2d Cir.2001)).  Similarly, federal common law also controls the damages recoverable against an interstate carrier by a shipper. See id.

### 1. Plaintiff's Claim Under the Carmack Amendment

Under the Carmack Amendment, a plaintiff is entitled to recover the "actual loss or injury to the property caused by ... the carrier." 49 U.S.C. § 14706.  A shipper establishes a prima facie Carmack case where it demonstrates (1) that the shipment was delivered to the carrier in good condition; (2) that the shipment was lost or arrived in damaged condition; and (3) that the shipper was harmed as a result. See Great Am. Ins. Co. v. USF Holland Inc., 937 F. Supp. 2d 376, 384 (S.D.N.Y. 2013).

Here, Plaintiffs have produced Ingram's contemporaneous records showing that the Shipment was comprised of 245 unique products containing 4,623 total units. (Id.)  Plaintiffs explain

that these units were all inspected prior to loading and, having been found to be in good order, were scanned by Ingram personnel and logged in Ingram's computer system. (Eagan Decl. Ex. 47, Decl. of Jeffrey N. Johnson ("Johnson Decl.") ¶ 3; id. Ex. 47-A.).  This assertion is consistent with the clean bill of landing issued for the Shipment and signed by ECM's driver. (Id. Ex. 33.)  Plaintiffs have therefore met their burden to establish that the Shipment was delivered to ECM in good condition. See A.I.G. Uru. Compania De Seguros, S.A. v. AAA Cooper Transp., 334 F.3d 997, 1007 (11th Cir. 2003) (addressing a lost shipment and noting that electronic records made contemporaneously with the "sealing" of a shipment that "directly and without inference identifies the contents of that carton" were sufficient to establish the shipment's contents and good condition").

Further, the elements of loss and harm are undisputed, as ECM admits that the entire Shipment was stolen during the course of delivery while being held at ECM's yard in New Kensington, Pennsylvania. (Answer ¶ 10.)  Plaintiffs are therefore entitled to a finding of both liability and damages under the Carmack Amendment.

### 2. ECM's Cross-Motion for Limited Liability

Once a prima facie Carmack case has been established, the burden shifts to the carrier to show that liability should be

excused based on any of several affirmative defenses (e.g., act of God, act of the shipper, inherent vice or nature of the goods). See Great Am. Ins. Co., 937 F. Supp. 2d at 384.  In the absence of an applicable defense, the carrier's liability is established under the Carmack Amendment for "actual loss or injury to the property" unless the carrier can establish that the parties either expressly contracted around the Carmack Amendment or that the shipper consented to limit the carrier's liability under an enforceable agreement. See 49 U.S.C. § 14706(a)(1); Great Am. Ins. Co., 937 F. Supp. 2d at 384.

### i.   The Underlying Services Agreement

In moving for partial summary judgment, ECM contends that its liability is limited to $100,000 under the "simple, unconditional" terms of the 2013 Schedule's released value provision. (Defs. Cross Reply at 6.)  In so doing, ECM asserts that the 2013 Schedule was not merely a pricing addendum to the 2007 Services Agreement, but was instead a fully integrated and independent contract that superseded all prior agreements between Ingram and ECM.

Where there are multiple agreements that might govern a carrier's liability, courts generally look to state principles of contract interpretation in order to determine what terms apply. See Great Am. Ins. Co., 937 F. Supp. 2d at 384 (noting that the issue of which limitation provision applied was "a

question of contract formation"); AIG Eur. (Neth.), N.V. v. UPS
Supply Chain Solutions, Inc., 765 F. Supp. 2d 472, 479-81
(S.D.N.Y. 2011) (addressing whether a shipper and carrier
entered into an enforceable agreement concerning a liability
limitation and applying New York contract law).

     Although Plaintiffs contend that California law should
govern contract interpretation in this case because of a
California choice of law provision contained in the 2007 Service
Agreement, the Court observes that applying this provision to
resolve questions of contract formation with respect to the 2013
Schedule—which contains no such clause—"would presume the
applicability of [this] provision before its adoption by the
parties has been established." See Kulig v. Midland Funding,
LLC, No. 13 Civ. 4715, 2013 WL 6017444, at *3 (S.D.N.Y. Nov. 13,
2013). Instead, because the issue of contract formation hinges
upon state law, "where parties call upon a federal court to
determine the validity of a contract," case law from within this
circuit suggests that courts should generally apply the choice-
of-law rules of the state in which they are located—in this
case, New York. Klein v. ATP Flight Sch., LLP, No. 14 Civ. 1522,
2014 WL 3013294, at *5 (E.D.N.Y. July 3, 2014); see also Follman
v. World Fin. Network Nat'l Bank, 721 F. Supp. 2d 158, 162
(E.D.N.Y.2010) ("To determine which state's law to apply to the
issue of contract formation, a federal court sitting with

10

federal question jurisdiction looks to the choice-of-law
doctrine of the forum state.").  The Court will therefore apply
New York's choice of law rules to the present case.

In New York, the first step in a choice of law analysis is
to "determine whether there is an actual conflict between the
laws of the jurisdictions involved." See El-Hanafi v. United
States, 40 F. Supp. 3d 358, 366 (E.D.N.Y. 2014); see also Curely
v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998).  To find that there
is an actual conflict, the laws in question must provide
different substantive rules, the "differences must be relevant
to the issue at hand," and they "must have a significant
possible effect on the outcome of the trial." Fin. One Pub. Co.
Ltd v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d
Cir. 2005) (internal quotation marks omitted).  In the absence
of such a conflict, New York rules state that courts should
bypass choice of law analysis and apply New York law. See Blue
Ride Farms, Inc. v. Crown Equip. Corp., No. 01 Civ. 8460, 2005
WL 755756, at *9 (E.D.N.Y. Mar. 28, 2005).

Although the parties dispute whether New York or California
law should govern contract interpretation in this case, the
Court finds that this issue does not present an actual conflict,
as the outcome appears to be the same regardless of which
state's law is chosen.  Under both California and New York law,
summary judgment is appropriate where the language of a contract

is unambiguous and the intent of the parties can be determined without reference to extrinsic evidence. See Seiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992); Producers Dairy Delivery Co. v. Sentry Ins. Co., 718 P.2d 920, 925 (1986).  Likewise, contract law principles from both states suggest that a contractual phrase is ambiguous only if it is reasonably capable of having more than one meaning when viewed in the context of the contract as a whole.[1] See Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987); MacKinnon v. Truck Ins. Exch., 31 Cal. 4th 635, 648 (2003); see also Producers Dairy Delivery Co., 718 P.2d at 925 ("We are also guided by the principle that words . . . must be read in their ordinary sense, and any ambiguity cannot be based on a strained interpretation of the [relevant] language.")

   Applying these principles to the present case, the Court concludes that a plain reading of the 2013 Schedule as a whole requires that it be read as an addendum to the 2007 Service Agreement.  Specifically, the merger clause upon which ECM

---

[1] Similarly, although not advocated by either party, the Court notes that there appears to be no meaningful conflict between the law of New York and that of Pennsylvania—the forum where the shipment originated, where the theft occurred, and where the ECM Defendants are organized. See Pacitti v. Macy's, 193 F.3d 766, 773 (3d Cir. 1999) ("If the contract as a whole is susceptible to more than one reading, the factfinder resolves the matter . . . .  On the other hand, where it is unambiguous and can be interpreted only one way, the court interprets the contract as a matter of law." (internal citation omitted)).

relies cannot be viewed in a vacuum, but must be reconciled with
the opening sentence's identification of the 2013 Schedule as
"[t]his Attachment." (Eagan Decl. Ex. 14, the 2013 Schedule.)
While terms are often susceptible to differing interpretations,
a court "will not torture words to import ambiguity . . . and
words do not become ambiguous simply because lawyers or laymen
contend for different meanings." Wards Co., Inc. v. Stamford
Ridgeway Assoc., 761 F.2d 117, 120 (2d Cir. 1985) (internal
quotation marks omitted).  Because the 2013 Schedule plainly
refers to itself as an attachment, the Court will not contort
the agreement's language to create ambiguity where there is
none.  Moreover, although not determinative, Plaintiffs'
explanation that the inclusion of a merger clause within the
2013 Schedule simply reflected the parties' intention to
supersede previous pricing addenda is a rational interpretation
of the agreement as a whole and is consistent with the inclusion
of similar clauses in every previous pricing agreement executed
between Ingram and ECM. (See Pls. Mem. at 21-22.)  Consequently,
the Court concludes that the 2013 Schedule must be read as
exactly what it purports to be—an attachment or addendum to the
parties' existing services contract.

      The Court must therefore determine the integrated terms of
the parties' services contract at the time of the Shipment.
Where two agreements apply to the same transaction, the later

                              13

agreement "supersedes only those terms of the earlier contract that are of the same subject matter." See CreditSights, Inc. v. Ciasullo, No. 05 Civ. 9345, 2007 WL 943352, at *6 (S.D.N.Y. Mar. 29, 2007); see also Han v. Mobil Oil Corp., 73 F.3d 872, 876 (9th Cir.1995) (noting that a later agreement merely "supersedes those terms to which it relates"); Gen. Signal Corp. v. MCI Telecomms. Corp., 66 F.3d 1500, 1506 (9th Cir. 1995) ("[T]he unmodified terms of the original agreement are to be applied together with the terms of the new, modifying agreement."). Accordingly, where the terms of the 2013 Schedule conflict with those of the 2007 Service Agreement, the 2013 Schedule will control.  At the same time, where the 2013 Schedule is silent, the Court will apply the unmodified terms of the 2007 Services Agreement.

### ii.   ECM's Right to Limited Liability

A carrier subject to the Carmack Amendment may only limit its liability under the "released value" doctrine. See 49 U.S.C. § 14706(c)(1); see also Commercial Union Ins. Co., 50 F. Supp. 2d at 260.  Under the released value doctrine, contractual provisions that purport to limit carrier liability for lost or damaged cargo—whether set out in an underlying service agreement, tariff, rate sheet, or bill of landing—are valid and enforceable so long as they (1) result in a "fair, open, just, and reasonable" agreement between the shipper and carrier and

14

(2) offer the shipper the option of higher recovery by paying a
higher rate. See Great Am. Ins. Co., 2008 WL 5335317, at *5.

     For their part, Plaintiffs dispute the enforceability of
the released value provision contained in the 2013 Schedule,
asserting that ECM failed to provide Ingram with a "reasonable
opportunity" to choose between different levels of liability as
required under federal common law. See Emerson Elec. Supply Co.
v. Estes Express Lines Corp., 324 F. Supp. 2d 713, 726-27 (W.D.
Penn. 1004) (summarizing the history of the Carmack Amendment).
Without wading too deeply into this issue, the Court notes that
the deposition testimony of Ingram's Vice President of Shipping,
Jeffrey Johnson, appears to support Defendants' assertion that
the $100,000 limitation of liability set out in the 2013
Schedule was the result of informed negotiations between Ingram
and ECM and reflected an actual choice by Ingram to reduce its
shipping costs. (Wright Decl. Ex. 57, Dep. of Jeffrey Johnson
("Johnson Dep.") 132:14-134:10) (explaining that Ingram
negotiated to reduce ECM's limited liability to $100,000 in
order "to keep costs down with ECM" and expressly acknowledging
that "the $100,000 released value [was] the accident liability
limit . . . that applied from February 6th, 2012 forward"); see
also Great Am. Ins. Co., 937 F. Supp. 2d at 387 n. 4 (limiting a
carrier's liability where the parties negotiated and "agreed to

a $25 per pound limitation with a cap at $100,000 per shipment"
which was then "codified in the agreement")).

Even assuming that the 2013 Schedule's released value
provision is enforceable under the released value doctrine,
however, the Court concludes that ECM's right to limited
liability is void in any case under the "material deviation"
doctrine.  The material deviation doctrine provides that a
"fundamental deviation from a shipping contract may make a[n
otherwise valid] liability limitation unenforceable".  <u>See</u>
<u>Nipponkoa Ins. Co. Ltd. v. Watkins Motor Lines, Inc.</u>, 431 F.
Supp. 2d 411, 417 (S.D.N.Y. 2006); <u>see also</u> <u>Great Am. Ins. Co.</u>,
2008 WL 5335317, at *5.  As Defendants note, the application of
the material deviation doctrine to overland and airborne
shipping cases has been narrowly construed. <u>See</u> <u>Praxair Inc. v.</u>
<u>Mayflower Transit, Inc.</u>, 919 F. Supp. 650, 654 (S.D.N.Y. 1996).
Even so, where a shipper has "paid an additional charge to
ensure specialized safety measures to reduce the risk of damage
to its cargo, the carrier's failure to perform those very
measures which resulted in damage to the cargo has been found to
be a sufficient basis" upon which to rescind a limitation of
liability provision contained in the parties' underlying
shipping agreement. <u>Praxair Inc.</u>, 919 F. Supp. at 656; <u>see also</u>
<u>Great Am. Ins. Co.</u>, 2008 WL 5335317, at *5 ("A separate payment

is not required if the separate risk-related promises are included in the rate negotiated between the parties.").

Caution is warranted.  Nevertheless, the Court is persuaded that application of the material deviation doctrine is appropriate in this case.  As discussed more fully below, ECM agreed under the terms of the 2007 Service Agreement to meet certain security measures as set forth in paragraph 13 when transporting Ingram's goods. (See infra pp. 19-21; Eagan Decl. Ex. 3, the 2007 Service Agreement ¶¶ 13.0-13.25.)  Subparagraph 15.3 of the 2007 Service Agreement also made clear that compliance with these security measures was a material condition of ECM's limited liability. (See id. ¶ 15.3 ("[B]reach of security . . . will be subject to the full replacement value of the product."); see also Nipponkoa Ins. Co., 431 F.Supp.2d at 415 (allowing the use of the material deviation doctrine where separately negotiated security guidelines specified that they "were 'material' and no deviation therefrom was permitted")).

Second, despite Defendants' arguments to the contrary, the Court concludes that both paragraph 13 and subparagraph 15.3 remained a part of the parties' underlying services contract at the time of the Shipment.  Although the 2013 Schedule states that ECM "will not be liable for losses in excess of $100,000" (Eagan Decl. Ex. 14, the 2013 Schedule), this statement is no broader than the original liability limitation provided under

17

subparagraph 15.2 of the 2007 Service Agreement, which stated
that "[i]n the event of loss and/or damage to any shipment,
[ECM's] liability will not exceed . . . a maximum liability of
$250,000 per shipment." (Id. ¶ 15.2.)  As noted above, where two
agreements apply to the same transaction, the later agreement
merely supersedes those terms in the original agreement to which
it directly relates. See Han, 73 F.3d at 876; see also
CreditSights, Inc., 2007 WL 943352, at *6 ("A subsequent
contract not pertaining to precisely the same subject matter
will not supersede an earlier contract unless the subsequent
contract has definitive language indicating it revokes, cancels
or supersedes that specific prior contract." (internal quotation
marks omitted)).

     Applying this rule of construction to the agreements at
issue, it is clear that the 2013 Schedule's $100,000 released
value must be read to supersede the $250,000 limitation imposed
under subparagraph 15.2 of the 2007 Service Agreement, as both
deal directly with the same subject.  By comparison, there is
nothing in the plain language of the 2013 Schedule's released
value provision to suggest that it was also intended to
supersede or revoke the "breach of security" exception under
paragraph 15.3.  The 2013 Schedule is similarly silent with
respect to ECM's security obligations under paragraph 13.  As a
result, these terms remained unmodified and a part of the

18

parties' underlying services contract at the time of the
Shipment, such that Plaintiffs are entitled to recover the full
replacement value of the Shipment if its loss was caused by a
breach of security.

The final question, therefore, is whether the loss of the
Shipment constituted a "breach of security." (Eagan Decl. Ex. 3,
the 2007 Service Agreement ¶ 15.3.)  Among other security-
related promises, paragraph 13 provided that ECM would use "best
efforts" to implement the agreed-upon security guidelines, that
it would "follow generally accepted practices and take all
reasonable precautions to protect [Ingram's] assets," and that
ECM would "ensure a level of security" as provided under the
services agreement "at all times." (Eagan Decl. Ex. 3, the 2007
Service Agreement ¶ 13.1.)

Although reasonable parties might disagree over the exact
measures that ECM was required to take to adequately secure
Ingram's goods, at the very least, "best efforts" and
"reasonable precautions" required ECM to meet the standards set
forth in its own written security guidelines.  Here, however,
the record indicates that ECM failed to follow its own security
guidelines in carrying the Shipment.  For example, ECM's own
Cargo Security Procedures instructs drivers generally "not [to]
leave your vehicle unattended" and to always park in a "secure
area." (Eagan Decl. Ex. 45; see also id. Ex. 16, ECM Driver

Safety and Compliance Policy Handbook ("If it is necessary to
leave a vehicle unattended, park in a well-lit, public secure
area.")  And yet, ECM has acknowledged that, at the time of the
theft, the front gate of the New Kensington yard was left open
(Meier Dep. 81:8-12, 92:1-5 ("The one gate you can't secure,
because the trucks are too long.")); that the car and trailer
were left unattended by the driver over the weekend (id. 59:18-
60:7); and that the yard had no security guards (id. 81:13-17).
Such a scenario cannot be considered "secure" under any
reasonable interpretation of the term. See MERRIAM-WEBSTER'S
COLLEGIATE DICTIONARY 1123 (11th ed. 2011) (defining "secure" as
"free from danger" or "free from the risk of loss").

    Moreover, although a breach of a carrier's "standard
delivery procedure" would not, on its own, justify recession of
the contract of carriage and any limited liability provision
contained therein (see Rafaella Gallery, Inc. v. United Parcel
Serv., Inc., 818 F. Supp. 53, 54 (S.D.N.Y. 1993)), rescission is
appropriate where the performance of security measures was a
material term of the parties' services contract. See Nipponkoa
Ins. Co., 431 F. Supp. 2d at 415 (finding that a defendant's
breach of several minimum security guidelines voided its limited
liability where the parties "expressly agreed that these
security guidelines were 'material' and no deviation therefrom
was permitted").  Accordingly, because the Court finds that

ECM's breached its security obligations to Ingram and that these
violations constituted material deviations from the agreed-upon
terms of the parties' contract of carriage, Plaintiffs are
entitled to rescind the 2013 Schedule's released value provision
and to recover from Defendants the full replacement value of the
Shipment.

### 3. Damages

In the absence of an enforceable released value provision,
Plaintiffs seek to recover in full for the loss of the Shipment.
Plaintiffs note that, in the event of "[b]reach of security,
willful misconduct, and/or employee theft", Ingram Micro is
entitled under the 2007 Agreement to recover "the full
replacement value of the product." (Eagan Decl. Ex. 3, the 2007
Service Agreement ¶ 15.3.)  Plaintiffs therefore submit evidence
showing the replacement cost for the stolen products, which
totals $561,165.81. (Johnson Decl. ¶ 5, Ex. D.)  Plaintiffs also
seek pre-judgment interest under New York's interest rules from
the date of the loss (August 17, 2013) on the ground that it is
deemed part of compensatory damages in cargo cases.  See A I
Marine Adjusters, Inc. v. M/V Siri Bhum, No. 05 Civ. 7227, 2007
WL 760415, at *8 (S.D.N.Y. 2007) (awarding 9 percent interest
rate in damaged cargo claim under New York's interest rules).
Finally, Plaintiffs contend that they are entitled to recover
survey costs of $5,384.41 that were incurred by Royal & Sun in

investigating the loss. See Fortis Corp. Ins. v. M/V Cielo Del
Can., 320 F. Supp. 2d 95, 107 (S.D.N.Y. 2004) (awarding survey
costs pursuant to the Carriage of Goods by Sea Act).

The amount of damages for actual loss or injury under the
Carmack Amendment are governed by federal common law, and are
generally based on the fair market value of goods that were lost
or damages. See Great Am. Ins. Co., 2008 WL 5335317, at *8.  A
court, however, need not apply the fair market value if an
alternative scheme is more appropriate. Id.  Accordingly,
because the 2007 Service Agreement states that damages will be
awarded based on the replacement value of the lost goods, the
Court will apply that value in awarding damages in this case.

By comparison, the parties' contract does not speak to the
appropriate rate of pre-judgment interest.  Although federal
courts have discretion in determining both whether to award pre-
judgment interest and the choice of interest rate to be applied,
courts in similar cases have generally applied the federal
interest rate "absent some reason in the facts of the case to do
otherwise." See Sec. Ins. Co. v. Old Dominion Freight Line,
Inc., 314 F. Supp. 2d 201, 203-204 (S.D.N.Y. 2003) (awarding
pre-judgment interest at the federal post-judgment rate in a
Carmack case), vacated on other grounds, 391 F.3d 77 (2d Cir.
2004); see also Atl. Mut. Ins. Co. v. Napa Transp., Inc., 399 F.
Supp. 2d 523, 527 (S.D.N.Y. 2005) (granting pre-judgment

interest at the federal post-judgment rate in a Carmack case and
noting that "there is no connection to New York which would
counsel in favor of applying that rate on a discretionary
basis").  Consistent with these prior decisions, the Court
concludes that pre-judgment interest should be awarded in this
case at the federal post-judgment interest rate. See 28 U.S.C. §
1961(a) (stating that interest should be calculated "from the
date of the entry of the judgment, at a rate equal to the weekly
average 1-year constant maturity Treasury yield" for the
calendar week preceding the date of judgment).

        Finally, Plaintiffs' request to recover survey costs is
denied.  The question of a shipper's compensation for actual
loss or injury to its property has been comprehensively
addressed by the Carmack Amendment, which does not provide for
the recovery of expenses. See Fireman's Fund Ins. Co. v. Never
Stop Trucking, Inc., No. 08 Civ. 3445, 2009 WL 3297780, at *3
(E.D.N.Y. Oct. 13, 2009).  Thus, the Court concludes that such
an award is not appropriate.

### III. Conclusion

        For the foregoing reasons, Defendant's cross-motion
requesting an order limiting their maximum liability to $100,000
is denied and Plaintiffs' motion for summary judgment seeking
damages in the amount of $561,168.81 is granted.  In addition,
Plaintiffs may recover pre-judgment interest, calculated at the

federal post-judgment interest rate under 28 U.S.C. § 1961(a) for the period beginning on August 17, 2013 up through the date of this order.  Finally, Plaintiffs' request to recover $5,384.41 in survey costs is denied.  The Court therefore directs the Clerk to enter judgment in Plaintiffs' favor in accordance with this order.


**SO ORDERED.**

Dated:     New York, New York
           August 31, 2015

                                    _John F. Keenan_
                                     John F. Keenan
                            United States District Judge